UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HELEN TSOUROULLIS,

            Plaintiff,                        Civil Action No. 10-cv-14721

       v.                              District Judge Stephen J. Murphy, III
                                       Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

            Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 17]**

     Plaintiff Helen Tsouroullis, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions and related papers (Dkts. 1, 13, 14, 16, 17, 18), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 2, 9).

**I. RECOMMENDATION**

     For the reasons set forth below, this Court finds that Plaintiff has not asserted any procedural errors and substantial evidence supports the ALJ's disability determination. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II.  REPORT

### A.  Procedural History

On August 29, 2007, Plaintiff filed an application for DIB asserting that she became unable to work on May 23, 2006.  (Tr. 52.)  The Commissioner initially denied Plaintiff's disability application on January 8, 2008.  (Tr. 52.)  Plaintiff then filed a request for a hearing, and on October 9, 2009, she appeared with counsel before Administrative Law Judge ("ALJ") Paul Armstrong, who considered the case *de novo*.  (Tr. 13-37.)  In a December 10, 2009 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 52-60.)  The ALJ's decision became the final decision of the Commissioner on September 22, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit appealing the Commissioner's decision on November 29, 2010.  (Dkt. 1.)

### B.  Background

Plaintiff was 41 years old on her alleged disability onset date.  (Tr. 106.)  She has a high-school education and previously worked as an emergency dispatcher and, more recently, a massage therapist.  (Tr. 128.)  In May 2006, Plaintiff underwent a mastectomy to treat Stage I breast cancer.  (Tr. 56, 263.)  On her Disability Report - Adult, Plaintiff stated, "I cannot use my left arm since the mastectomy.  My arm swells and it is weak.  I have pain in my left arm and under the arm."  (Tr. 127.)  Plaintiff also had several surgical reconstructions or revisions after her mastectomy and began having urticaria (i.e., hives or a rash) in October 2007.

2

### 1. The Hearing Before the ALJ

#### (a) Plaintiff's Testimony

At the October 2009 hearing before the ALJ, Plaintiff primarily testified about her urticaria and swelling in her upper extremities post-mastectomy. She testified to the somewhat unpredictable nature of the hives, explaining, "I just was sitting [watching my son's hockey game] and . . . my arms broke out, my hands broke out, I swelled up for no reason." (Tr. 17-18.) Plaintiff attested that "when the swelling occurs I have to lay down, put my arm up . . . and wait and wait and wait." (Tr. 18.) For example, after washing dishes, Plaintiff said she would have to "lay on the couch for two hours." (Tr. 22.) Accordingly, she explained, she "had to watch what [she] was doing." (Tr. 22.)

As for urticaria medication, the ALJ asked about prednisone that, based on the medical record  the ALJ was examining at the hearing, appeared to clear up the hives. (Tr. 21.) Plaintiff's attorney explained that "certainly it cleared it up at that time but . . . it keeps [recurring]." (Tr. 28.) Plaintiff added that the medication prescribed for her hives "doesn't stop the breakout, it just, it makes me go to sleep so it'll go away." (Tr. 35; *see also* Tr. 43.) Plaintiff also testified that she does not prefer to take her hives medication because of the side-effects:

> [A]ny [hives] medication I take I, I get too sleepy, I can't handle that, I can't handle just sleeping all the time. It's bad enough I have to sit back and rest after I do anything and let alone sleep the rest of the day or the rest of the night, whatever time it may occur. I don't like taking medication.

(Tr. 29.) Instead, Plaintiff explained, "I don't push myself like I use[d] to. That's why I don't take the medication now . . . unless I totally absolutely need it if I start swelling to the point of . . . breaking skin." (Tr. 30.)

3

When the ALJ inquired into why her hives would prevent her from performing her past work as an emergency dispatcher, which the ALJ remarked was a sedentary job, Plaintiff explained that her hands would swell to the point where she could not use the computer necessary for that position. (Tr. 20.)  At one point in her testimony she stated that the swelling caused her fingers to "split." (Tr. 18.)

The ALJ also inquired about a medical record from Plaintiff's oncologist, Dr. Carrie Dul, which, as explained by the ALJ, stated that Plaintiff's pain was limited to occasional aches.  (Tr. 40.) Plaintiff responded by explaining that her oncologist was not the person she would report her pain to because, when she visited her oncologist, her concern was whether she had a recurrence of cancer. (Tr. 40.)  She stated that she instead reports her chest pain to her plastic surgeon as he was the physician involved in reconstruction.  (Tr. 40.)

Perhaps because the ALJ commented, several times, that Plaintiff had a "good result" from her mastectomy in terms of cancer (Tr. 33, 38, 41), Plaintiff's attorney asked the ALJ to consider absences from work caused by Plaintiff's hives and procedures post-mastectomy, and to view Plaintiff's case as a "pain case" (Tr. 31, 43).  Specifically, Plaintiff's attorney argued, "if we were putting her in a work place she'd be missing so many days of work.  And this is really an issue of sustainability. . . . [T]here's no way that she could sustain employment with the amount of procedures that she's undergoing."  (Tr. 31-32.)  And further, "As someone who has gone through procedures that cause pain, pain that is going to keep her from sustaining employment . . . .  This is not a breast cancer case, this is a pain case."  (Tr. 43.)

Finally, Plaintiff testified about her activities of daily living.  Plaintiff stated that she lived in a two-story house, was married, and had two children who lived at home. (Tr. 23.)  Prior to her

mastectomy she explained that she was "very active" including roller-blading. (Tr. 25.) At the time of the hearing, however, Plaintiff suggested that her ability to cook was limited, and stated that she went shopping or cleaned the house when she feels she is able. (Tr. 24.) Plaintiff also testified that she would "love" to continue to work as a massage therapist but "my general surgeon had told me if . . . I do massage therapy [lymphedema] is definitely going to happen to you." (Tr. 26, 32.)[1] When the ALJ asked about Plaintiff's part-time work as a care taker, Plaintiff explained that the job was not physical, "all verbal command." (Tr. 21-22.) Plaintiff also noted that "[t]here's days I can't do anything, I just got to stay home." (Tr. 24.)

*(b) Vocational Expert's Testimony*

Vocational Expert ("VE") Annette Holder also testified at Plaintiff's hearing before the ALJ. (Tr. 34.) The ALJ asked the VE if someone limited to "light exertional duties" could perform Plaintiff's past work as an emergency dispatcher (sedentary but skilled work); the VE answered affirmatively. (Tr. 35-36.) The ALJ then proposed a slightly more limited hypothetical individual: one limited to light work and a "low stress job" with no "dangerous or emergency situations." (Tr. 36.) The VE responded that such an individual could perform the work of a general office clerk, housekeeper, and information clerk (all light, unskilled jobs) and that there were 2,500, 4,800, and 1,300 such jobs in the region. (Tr. 36.)

The ALJ then inquired into how much time a hypothetical individual could miss work. (Tr. 36-37.) The VE testified that if an individual was off task for two hours once a week, "they wouldn't be able to sustain employment." (Tr. 37.) The VE also testified that if someone missed

---

[1]Stedmans Medical Dictionary (27th ed. 2000) (defining "lymphedema" as "[s]welling (especially in subcutaneous tissues) as a result of obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region.").

more than two days a month because of procedures, the individual would not be able "to sustain competitive employment." (Tr. 37.)

###### 2.  *Medical Evidence*

On May 1, 2006, in view of an abnormal left-breast mammogram, Plaintiff underwent a left-breast biopsy that revealed invasive breast cancer. (Tr. 227, 263.)

On May 23, 2006, Plaintiff underwent a two-part surgery: a bilateral mastectomy and axillary lymph node dissection performed by Dr. Dharti Sheth and bilateral breast reconstruction with tissue expanders performed by Dr. Jeffery Williams. (Tr. 202, 223-26, 263.) Plaintiff had followup visits on May 30, June 1, and June 5, 2006 to monitor drainage and remove drains. (Tr. 202, 210.)

On June 13, 2006, Plaintiff saw her oncologist, Dr. Dul and discussed adjuvant chemo- and hormonal-therapy post-surgery. (Tr. 263-64.) Plaintiff reported that she was "still having some residual pain and some drainage, although it is decreasing from the left breast." (Tr. 263.) She also reported that "other than the diagnosis of breast cancer and her surgery, she has been feeling [that she is] in her usual state of good health." (Tr. 263.) Dr. Dul noted that the wounds from the surgery "appear to be healing well with no evidence of infection, significant edema or drainage . . . . There is no evidence of lymphedema in the arms." (Tr. 263.)

On June 15, 2006, Plaintiff underwent her first breast expansion. (Tr. 202.) A followup visit on June 19, 2006 with Dr. Jeffrey Williams, a surgeon, indicates that Plaintiff was "doing well" and that her incisions were healing nicely. (Tr. 201, 207.) On June 22, Plaintiff underwent another expansion, and on June 30, 2006 her physician indicated the possibility of cellulitis (a skin infection) and encouraged Plaintiff not to take a mission trip to the Dominican Republic so that she could have a followup exam. (Tr. 201.) Plaintiff went on the trip, however. (Tr. 201, 208.)

On July 13, July 21, and July 28, 2006, Plaintiff had tissue expansions. (Tr. 200-01.) On July 19, 2006, Plaintiff had a postoperative visit with Dr. Sheth. (Tr. 208.) She denied any fever, chills, or incisional drainage. (Tr. 208.) Dr. Sheth noted that Plaintiff's incisions were healing well, she had mild tenderness along the side of the left expander but no residual erythema or fluctuance, and had a "good range of motion of both upper extremities without any edema." (Tr. 208.) Dr. Sheth's plan was to continue expansions and he advised Plaintiff "to avoid any repetitive motions with the left arm . . . or needle sticks in hopes of minimizing risk for lymphedema." (Tr. 208.) Dr. Sheth noted that Plaintiff expected "to have the expander . . . replaced with the permanent implants in about six weeks." (Tr. 208.) On August 4, 2006 Plaintiff had her last expansion. (Tr. 200.)

On August 14, 2006, Plaintiff had a visit with her oncologist, Dr. Carrie Dul. (Tr. 216-17.) Dr. Dul noted that Plaintiff "feels like she is in her usual state of health." (Tr. 216.) She remarked that Plaintiff had "fully recovered from her surgery" and that she was continuing to have expansions for planned implant reconstruction. (Tr. 216.) Plaintiff's physical exam revealed that her incisions were "well healed" and Dr. Dul found "no evidence of infection or lymphedema." (Tr. 216.)

On October 10, 2006, Plaintiff underwent surgery to remove the tissue expanders and implant bilateral gel prostheses. (Tr. 179-80, 221-22.) The surgical notes indicated that Plaintiff "tolerated the procedure well." (Tr. 181.) Two days later, Plaintiff was seen for a followup and the physician noted that Plaintiff "look[ed] great," and scheduled Plaintiff for another followup in a month. (Tr. 199.)

On November 13, 2006, Plaintiff had a "routine followup" with her oncologist. (Tr. 261.) Dr. Dul noted that Plaintiff has "recovered well" from her then-recent implant surgery and Plaintiff reported that she was "in her usual state of health." (Tr. 261.) Dr. Dul found that there was no

7

"palpable lymphadenopathy, no suspicious skin masses, nodules lesions or skin changes. There is no lymphedema." (Tr. 261.)

Almost a year later, on October 29, 2007, Plaintiff visited Dr. Williams for a post-implant followup exam. (Tr. 233.) Plaintiff expressed "concern[] with asymmetry." (Tr. 233, 247-48.) Accordingly, on November 5, 2007, Dr. Sheth indicated plans to replace Plaintiff's right implant. (Tr. 247.) He also noted that Plaintiff "complains of some itching and mild rash on her hands for the past week." (Tr. 247.)

On November 13, 2007, Plaintiff underwent implant exchange surgery. (Tr. 232.) On November 19, 2007, Dr. Williams observed that her incisions were healing nicely, with no sign of infection or seroma. (Tr. 232.)

On November 26, 2007, Plaintiff had a visit with Dr. Dul apparently to discuss certain lab results. (Tr. 260.) Dr. Dul noted that Plaintiff "had no complications" from her recent implant exchange and that "she has been in her usual state of health." (Tr. 260.) Plaintiff reported "[n]o headaches or visual changes, bone pain, change in appetite, energy, [or] blood in her urine or stool." (Tr. 260.) Dr. Dul's review of Plaintiff's systems were "negative for any other pertinent findings." (Tr. 260.)

Days later, on November 29, 2007, Plaintiff went to urgent care with complaints of hives. (Tr. 269.) The assessment provides that Plaintiff had a rash all over, with swelling in her hands and ankles. (Tr. 269.) Plaintiff was prescribed solumedrol and prednisone. (Tr. 269.)

In December 2007, Plaintiff saw Dr. Edward Lerchin for the first of several visits regarding her urticaria or hives. (Tr. 241-43.) On December 3, 2007, Dr. Lerchin noted urticaria patches on Plaintiff's legs, arms, and trunk. (Tr. 243.) He prescribed Atarax and prednisone. (Tr. 243.) On

December 10, 2007, he noted "good improvement of hives, occasional flare, no itching." (Tr. 242.) On January 27, 2008, Plaintiff reported that her hives had been clear until a day before the exam. (Tr. 242.) Dr. Lerchin noted edema in Plaintiff's hands and urticaria on Plaintiff's palms, neck, abdomen, legs, and feet. (Tr. 242.) He prescribed prednisone. (Tr. 242.) Plaintiff returned for a followup three days later; Dr. Lerchin found that Plaintiff had "prominent urticaria [on her] harms, chest, abdomen, and legs [but her] edema [had] cleared on [her] hands." (Tr. 242.)

On January 8, 2008, Dr. William Joh completed a Case Analysis form on behalf of the State Disability Determination Services ("DDS"). Dr. Joh completed the form with a single word: "nonsevere." (Tr. 235.) An accompanying Request for Medical Advice form states that the Medical Examination Report ("MER") "in [the] file show[s] that [claimant] no longer has the brea[s]t cancer and [the] MER also indicates that she does not have lymphedema. DE [Dr. Joh?] recommends non-severe, otherwise please complete [a Residual Functional Capacity Assessment]." (Tr. 234.)

On January 21, 2008, Dr. Murakawa, on referral from Dr. Lerchin, examined Plaintiff for urticaria. (Tr. 237.) He noted that her lesions lasted for less than 24 hours and were not accompanied by lip or tongue swelling. (Tr. 237.) Dr. Murakawa stated that generally the cause of the urticaria is difficult to identify and he treated Plaintiff with fexofenadine and Zyrtec. He noted, "If she continues to develop lesions, I will consider adding an H2 blocker, doxepin, and low-dose prednisone." (Tr. 237.)

On April 4, 2008, Plaintiff returned to Dr. Lerchin who noted somewhat cryptically, "OK Atarax 10 mg." (Tr. 241.)

On June 18, 2008, Plaintiff returned for a followup visit with Dr. Sheth regarding her implant exchange. (Tr. 245-46.) Plaintiff reported that she was "pleased with the overall outcome" but

9

reported "problems with hives and associated pain starting in the hands versus the chest versus the thighs any time that she is doing exertional activity." (Tr. 245-46.) Plaintiff denied, however, "any ongoing swelling of the arms" but reported "occasional swelling in the fingers in the left arm." (Tr. 245.) Upon exam, Dr. Sheth found no visible edema or hives, and a "good range of motion" in Plaintiff's extremities. (Tr. 245.) Dr. Sheth reviewed precautions to prevent lymphedema with Plaintiff. (Tr. 245.)

On November 3, 2008, Plaintiff had an annual visit with her oncologist. (Tr. 258.) Plaintiff reported to Dr. Dul that she had "a remission from [urticaria] symptoms and then had final reconstructive surgery [followed by an] exacerbation of . . . symptoms. The urticaria is associated with some shortness of breath and wheezing." (Tr. 258.) Plaintiff also reported that "Benadryl and antihistamines ma[de] things worse or put her to sleep." (Tr. 258.) Other than the urticaria, Plaintiff told Dr. Dul that she had been in her usual state of health. (Tr. 258.) Upon exam, Dr. Dul found that Plaintiff had no lymphedema or edema in her extremities. (Tr. 258.)

On February 23, 2009, Plaintiff saw Dr. Dul for a routine followup. (Tr. 256.) Plaintiff told Dr. Dul that she had been "exercising fairly regularly, following a fairly good diet" and that her urticaria had "subsided somewhat." (Tr. 256.) Plaintiff believed that "her [urticaria] triggers are changes in temperature when she exercises vigorously outdoors." (Tr. 256.) Plaintiff was not taking any medication for urticaria. (Tr. 256.) Dr. Dul's system review was negative, and Plaintiff had no edema in her extremities or lymphedema. (Tr. 256.)

On August 31, 2009, Plaintiff returned for a followup exam with Dr. Williams. (Tr. 284.) Plaintiff reported "that overall she has been doing well." (Tr. 284.) Plaintiff discussed with Dr. Williams "several areas of concern from her reconstruction," including slight asymmetry and

10

fullness.  (Tr. 284.)  Dr. Williams discussed the possibility of "removal of the implant, revision of the inframammary fold and possibly using external bolsters as well."  (Tr. 284.)

That same day, August 31, 2009, Plaintiff had a routine followup with Dr. Dul.  (Tr. 276.) Dr. Dul noted that since she had last seen Plaintiff, "she has been doing well."  (Tr. 276.)  She noted that Plaintiff had taken a job "as a caregiver for a disabled teenager," and that Plaintiff had been doing "occasional exercise" and is "very active with work."  (Tr. 276.)  Plaintiff reported some aches in her back and in her left sciatic nerve and in her right elbow "related to activity . . . that usually goes away with rest when she stops the same activity."  (Tr. 276.)  The remainder of Plaintiff's system was negative, including no lymphedema.  (Tr. 276.)

On September 21, 2009, a couple weeks before Plaintiff's hearing before the ALJ, Dr. Dul completed a Physical Residual Functional Capacity Questionnaire.  (Tr. 279-82.)  Dr. Dul indicated that Plaintiff's symptoms consisted of "[o]ccasional aches in [her] back, left sciatic nerve and [right] elbow related to activity."  (Tr. 279.)  Dr. Dul also provided that Plaintiff had "no [complaints of] pain except for occasional aches."  (Tr. 279.)  Dr. Dul noted that Plaintiff's pain and symptoms would "frequently" (one- to two-thirds of a workday) "interfere with attention and concentration needed to perform even simple work tasks." (Tr. 280.)  She provided that Plaintiff could only sit and stand/walk for about 4 hours in an eight-hour workday, and that Plaintiff could only walk "2 blocks due to [her] arms swelling."  (Tr. 280.)  According to Dr. Dul, Plaintiff would have to rest 20-30 minutes during work on a daily basis, and could only perform fine finger manipulations for 60% of an 8-hour workday.  (Tr. 282.)

Shortly after the hearing before the ALJ, on October 30, 2009, Plaintiff underwent a "revision bilateral breast reconstruction."  (Tr. 284; *see also* Tr. 279.)  Three days later, Plaintiff saw

Dr. Williams for a postoperative exam.  (Tr. 284.)  He noted that "[o]verall, she is doing well.  No hives or other issues postoperatively."  (Tr. 284.)  Dr. Williams cautioned Plaintiff "against strenuous activity, vacuuming, lifting, and range of motion of the left arm, particularly to avoid release of the inframammary fold."  (Tr. 284.)

Although not part of the record before the ALJ, Plaintiff has informed the Court that on April 9, 2010, she underwent a "[f]inal surgical procedure," and, that in September 2010, she returned to full-time work as an emergency dispatcher.  (Dkt. 17, Pl.'s Mot. Summ. J. at ECF 2.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment

12

meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between her alleged onset date of May 23, 2006 and September 30, 2008, the date she last met the insured status requirements under the Act ("date last insured"). (Tr. 54.) At step two, the ALJ found that Plaintiff had the following severe impairments: "urticaria, residual effects of bilateral breast cancer, status post mastectomy and reconstruction." (Tr. 54.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 54.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "the full range of light work as defined in 20 CFR 404.1567(b)." (Tr. 55.) That section defines light work as follows,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or

13

> when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls.  To be considered capable of
> performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities.  If someone can do
> light work, we determine that he or she can also do sedentary work,
> unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); *see also* S.S.R. 83-10, 1983 WL 31251, at *5 ("Since frequent lifting or

carrying requires being on one's feet up to two-thirds of a workday, the full range of light work

requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour

workday.").  At step four, the ALJ found that Plaintiff could return to her past relevant work as an

emergency dispatcher.  (Tr. 58.)  Proceeding in the alternative, at step five the ALJ relied on VE

testimony in response to his hypothetical, and found that work existed in significant numbers that

Plaintiff could perform: general office clerk (2,500 jobs in southeastern Michigan), housekeeper

(4,800 jobs), and information clerk (1,300 jobs).  (Tr. 59.)  Accordingly, the ALJ found that Plaintiff

was not under a disability, as defined by the Act, between May 23, 2006 and September 30, 2008.

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by substantial evidence

in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative

proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights

because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also*

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it

must be affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545

(6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of

choice within which the decisionmakers can go either way, without interference by the courts"

(internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is

limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court

"may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this

Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc.*

*Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without

directly addressing in his written decision every piece of evidence submitted by a party." (internal

quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in

evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the

credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff has not argued that the ALJ committed any procedural or legal error.  Rather, she emphasizes that she has had five surgeries since her initial biopsy on May 1, 2006, and that, through the time of the ALJ's December 2009 decision, "I had not completed all my treatments and procedures and was not able to perform my job/business as a massage therapist or seek employment at a prior job as emergency dispatcher."  (Dkt. 17, Pl.'s Mot. Summ. J. at ECF 1, 3.) Plaintiff supports this claim with a timeline of her medical procedures.  (Pl.'s Mot. Summ. J. at ECF 2.) Because Plaintiff essentially argues that the ALJ improperly considered the evidence or record, the Court will review the ALJ's factual findings and disability determination for substantial evidence.

#### 1.  Plaintiff's Surgical Procedures Would Not Have Prevented Substantial Gainful Employment for a Continuous Period of At Least 12 Months

Although not explicitly addressed by the ALJ, even if the surgical procedures that Plaintiff underwent in connection with her mastectomy and reconstruction would have initially caused Plaintiff to miss substantial time from work, this would not have altered the ALJ's disability determination.  As relevant here, "disability" under the Act requires an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or *which has lasted or can be expected to last for a continuous period of not less than 12 months.*"  42 U.S.C. § 423(d)(1)(A) (emphasis added); *see also* 20 C.F.R. § 404.1509.  In addition, "[i]n order to establish entitlement to disability insurance benefits, an individual must establish that [she] became 'disabled' prior to the expiration of [her] insured status."  *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (citing 42 U.S.C. § 423(a), (c); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).  Substantial evidence in the record

supports a conclusion that the functional limitations after each of Plaintiff's reconstruction procedures did not last for a continuous period of at least 12 months.

Plaintiff's medical procedures may have caused her to miss significant time from any "light work" job from May through October 2006. Plaintiff underwent a biopsy and then a mastectomy with reconstruction in May 2006, a series of out-patient expansions in June, July, and early August 2006, and then reconstructive surgery on October 10, 2006.

But even granting that these medical procedures and associated functional limitations, if any, prevented Plaintiff from engaging in substantial gainful activity during these six months, in November 2006 Plaintiff informed Dr. Dul that she had "recovered well" from her October 2006 implant exchange, was "doing well," and was in her "usual state of health." (Tr. 261.) Further, Dr. Dul's review of Plaintiff's systems was negative. (Tr. 261.) After October 2006, Plaintiff underwent no further surgical procedures for a year. (*See* Dkt. 17, Pl.'s Mot. Summ. J. at ECF 2.) The record therefore suggests that Plaintiff could perform light work during this one-year period.

On November 13, 2007, Plaintiff underwent implant exchange surgery. (Tr. 232.) However, substantial evidence also indicates that Plaintiff could have performed light work shortly after that procedure. On November 19, 2007, Dr. Williams noted that Plaintiff's incisions were healing nicely with no sign of infection or seroma. (Tr. 232.) Two weeks after the surgery, on November 27, 2007, Plaintiff reported to Dr. Dul that she had "no complications" from her exchange and that she was in her ususal state of health. (Tr. 260.) Dr. Dul's review of Plaintiff's systems were negative. (Tr. 260.) It is also somewhat telling that when Plaintiff underwent a subsequent reconstruction surgery in 2009, Dr. William's notes just three days after that surgery only cautioned Plaintiff against *strenuous activity*, vacuuming, lifting, and range of motion of the left arm." (Tr. 284

17

(emphasis added).)  In short, while an inference may be drawn that Plaintiff required a prolonged recovery time after the November 2007 surgery, substantial evidence also supports the opposite inference.

For almost two years Plaintiff had no further surgical procedures.  Her next was on October 30, 2009 – over a year after her date last insured.  (*See* Pl.'s Mot. Summ J. at ECF 2.)

Thus, from the alleged onset date through her date last insured, Plaintiff's medical procedures could have forced her to miss significant work-time for a period of six months: May 2006 through October 2006.  But substantial evidence supports the conclusion that beginning in November 2006 her surgical procedures and associated recovery would not have prevented her from engaging in "light work" for a continuous period of 12 months.[2]  Because it is reasonable to conclude that Plaintiff's surgical procedures and limitations during recovery did not satisfy the Act's durational requirement, substantial evidence supports a finding that Plaintiff did not establish that was disabled from those procedures and limitations between her alleged onset date through well after her date last insured.

> 2.   *Substantial Evidence Supports the ALJ's Determination that Plaintiff's Functional Limitations from Urticaria Did Not Preclude Light Work*

The ALJ found that Plaintiff only suffered from "mild symptoms of urticaria," that these symptoms "have never caused a significant functional limitation," and that any such functional limitations would not preclude Plaintiff from performing "light work" (which involves lifting 10 pounds frequently and standing or walking for up to about six hours in an eight-hour day).  (Tr. 55, 58.)  Plaintiff testified that urticaria prevented her from performing her dispatcher job because her

_____

[2]The Court reaches a similar conclusion regarding Plaintiff's urticaria, but the analysis is presented separately below.

hives would cause her hands to swell to the point where she could not use the computer.  (Tr. 20.)
Plaintiff also testified that an outbreak, which could occur while watching her son play hockey or
after washing the dishes, caused her to lie down and elevate her arm for hours.  (Tr. 22.)  While
Plaintiff's testimony may support a finding of disability, viewing the record as a whole, substantial
evidence supports the ALJ's conclusion that Plaintiff's urticaria did not preclude light work.

First, although Plaintiff testified to the somewhat unpredictable nature of the urticaria,
elsewhere Plaintiff believed it was connected to exertion. (Tr. 245-46.)  In fact, as noted by the ALJ,
on February 23, 2009, Plaintiff reported to Dr. Dul that her urticaria had somewhat subsided and
occurred in fairly unique circumstances: Plaintiff "believe[d] that her triggers are changes in
temperature when she exercises vigorously . . . outdoors."  (Tr. 56, 256.)

Second, Plaintiff's treatment record for urticaria is fairly conservative; this also supports the
ALJ's conclusion that the associated symptoms were mild.  Plaintiff first reported urticaria-like
symptoms to Dr. Sheth on November 5, 2007 (Tr. 247), but nothing suggests that Dr. Sheth treated
those symptoms and Plaintiff went forward with surgery shortly thereafter.  On November 29, 2007
Plaintiff went to urgent care with a full-body rash and swelling in her hands and ankles.  (Tr. 269.)
Plaintiff was prescribed medication including prednisone.  (Tr. 269.)  On December 3, 2007, Dr.
Lerchin began treating Plaintiff for urticaria; a week later, he noted that Plaintiff had "good
improvement," apparently from prescription medication, and on January 27, 2008 Plaintiff reported
that she had remained urticaria-free until the day before the exam. (Tr. 242-43.)  Plaintiff's urticaria
remained present three days later.  (*See* Tr. 242.)  An April 4, 2008 visit to Dr. Lerchin does not
indicate whether Plaintiff had an outbreak at that time, however.  (Tr. 241.)  The next mention of
urticaria was two months later, when Dr. Sheth noted that Plaintiff "continues to have problems with

19

hives" but also found that Plaintiff had "no hives" at that time and that Plaintiff had been prescribed Atarax to be taken on an "as needed" basis. (Tr. 245.) Five months later, Plaintiff explained to Dr. Dul that she had "some issues" with urticaria "recently." (Tr. 258.) Almost four months later, Dr. Dul noted that Plaintiff "continues to have urticaria. It has subsided somewhat. She is not having them as frequently." (Tr. 256.) Plaintiff was not taking any medication for urticaria at that time. (Tr. 256.) On August 31, 2009, Plaintiff saw Dr. Williams yet reported no problems with urticaria. (Tr. 284.) And Dr. Dul's September 2009 Physical Residual Functional Capacity Questionnaire makes no mention of urticaria. Thus, it appears that Plaintiff primarily sought treatment for her urticaria from December 2007 through January 2008. After Plaintiff's April 2008 visit with Dr. Lerchin, there are no further records indicating that Plaintiff sought treatment for urticaria. Plaintiff's subsequent reports to Drs. Seth and Dul were months apart and do not indicate how frequently Plaintiff was suffering from urticaria episodes or how Plaintiff was treating any such episodes.

Third, and closely related to the second point, is that aside from Plaintiff's hearing testimony, there is no evidence, medical or otherwise, of *functional limitations* resulting from Plaintiff's urticaria. This is despite, as just recounted, Plaintiff's reports of urticaria to various physicians over the years. The closest any physician came to making a functional finding was Dr. Dul in her Physical Residual Functional Capacity Questionnaire. There, Dr. Dul noted that Plaintiff could only walk two blocks because her arms would swell. (Tr. 280.) But, as will be discussed more fully below, the ALJ gave good reasons for not crediting Dr. Dul's opinion, and, moreover, it is not clear that Dr. Dul linked the arm swelling to Plaintiff's urticaria.

In short, examining the record as a whole, it was not unreasonable for the ALJ to have

20

concluded that Plaintiff's urticaria did not preclude light work; accordingly, substantial evidence supports the ALJ's conclusion in this regard.[3]

### 3. The ALJ Complied with the Procedural Aspects of the Treating Physician Rule and Substantial Evidence Supports His Decision to Reject Dr. Dul's Opinion

As noted, Dr. Dul was the only physician who provided functional limitations for Plaintiff. In her September 2009 Physical Residual Functional Capacity Questionnaire ("RFC Assessment"), Dr. Dul opined that Plaintiff's pain and symptoms would "frequently" (i.e., from one- to two-thirds of a workday) "interfere with attention and concentration needed to perform even simple work tasks." (Tr. 280.) She also provided that Plaintiff could only sit and stand/walk for about 4 hours total in an eight-hour workday, and that Plaintiff's arm swelling limited walking to "2 blocks." (Tr. 280.) According to Dr. Dul, Plaintiff would have to rest 20 to 30 minutes during work on a daily basis. (Tr. 282.)

The ALJ, although not as explicit as he should have been, rejected Dr. Dul's opinion. He explained that Dr. Dul's limitations are "entirely unsubstantiated" by the longitudinal treatment record including Dr. Dul's own notes. (Tr. 57.) After explaining that Dr. Dul's opinion was based on reported symptoms that did not appear elsewhere in the record and were not reproduced on exam, he concluded his treating-source analysis as follows:

> Dr. Dul's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the case record. As such, it cannot be accorded controlling weight. It is, however, still entitled to due deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. The nature and extent of Dr. Dul's

---

[3]To the extent that Plaintiff suffered from some functional limitations due to her urticaria, it is also notable that the ALJ alternatively found that Plaintiff could return to her past work as an emergency dispatcher which is sedentary work.

> treatment relationship with the claimant supports the allocation of greater weight, as does her specialization in oncology, although she did not identify limitations based on oncological symptoms. However, the doctor's opinion is not well-supported or well-explained, and is not consistent with the record as a whole. Considering these defects, the undersigned declines to assign weight to Dr. Dul's opinions regarding the claimant's functional limitations.

(Tr. 57.)

Under the treating source rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p. And even where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Id.*; 20 C.F.R. § 404.1527.

The treating-source rule also "contains a clear procedural requirement." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(d)). In particular, "the [ALJ's] decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188 at *5; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.

2007).  Moreover, "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The ALJ in this case complied with the procedural aspects of the treating-physician rule and his ultimate decision to reject Dr. Dul's opinion is within the "zone of choice" accorded an ALJ on substantial evidence review.

As to whether Dr. Dul's opinion was entitled to controlling weight, the ALJ pointed out that Dr. Dul provided that Plaintiff had the following "symptoms" from a "diagnosis" of breast cancer: "occasional aches in back, left sciatic nerve and [right] elbow related to activity . . . . No [complaint of] pain except for occasional aches as listed . . . ." (Tr. 279; *see also* Tr. 56-57.)  But, as explained by the ALJ, these symptoms do not appear in the record except for in one of Dr. Dul's notes the month before she completed the RFC Assessment.  There, Dr. Dul did not directly associate these symptoms with the effects of Plaintiff's surgeries; she instead noted, "Occasionally, [Plaintiff] has had some aches in her back and in her left sciatic nerve and in her right elbow related to activity she has done that usually goes away with rest when she stops that same activity."  (Tr. 276.)  Moreover and critically, as the ALJ reasoned, Plaintiff's back, sciatic, and elbow symptoms first appeared in the record after Plaintiff's date last insured.  (Tr. 57.)

The Court also notes that Dr. Dul's opinion that Plaintiff could only walk 2 blocks due to swelling in her arms appears to lack support in the record.  It is entirely unclear where this limitation comes from.  In each of the exams Plaintiff had with Dr. Dul, Dr. Dul found no lymphedema.  (Tr. 216, 256, 258, 261, 263, 276.)  Dr. Dul did not list urticaria as one of Plaintiff's "symptoms" in her

RFC Assessment so it is unclear whether she believed that was the cause of the arm swelling. (Tr. 279.) In fact, in her August 2009 notes apparently referenced by the RFC Assessment, Dr. Dul made no mention about urticaria. Further, a month before the RFC Assessment, Plaintiff reported to Dr. Dul that she was doing "occasional exercise" and was "very active" in her job as caretaker for a disabled teenager. (Tr. 276.) Dr. Dul even counseled Plaintiff regarding "regular cardiovascular exercise." (Tr. 276.)

After reasonably deciding that Dr. Dul's opinion was not entitled to controlling weight, the ALJ then explicitly discussed the factors related to weighing a treating-source opinion. In this regard, he reasonably concluded that while Dr. Dul was an oncologist, "she did not identify limitations based on oncological symptoms." (Tr. 57.) This Court's review of Dr. Dul's notes indicates that she never treated Plaintiff for back, elbow, or sciatic problems, lymphedema, or urticaria. In fact, Plaintiff testified that when she went to see Dr. Dul, her primary concern was whether she had cancer. (Tr. 40.) The ALJ also explicitly discussed the third and fourth weighting factors, concluding that Dr. Dul's opinion was not well supported or explained, and that it was not consistent with other evidence of record. (Tr. 57.)

In short, the ALJ's treating-source analysis was sufficient to provide this Court and Plaintiff with his reasons for rejecting Dr. Dul's opinion, and the ALJ's decision to reject that opinion is supported by substantial evidence.

### 4.  Dr. Dul's Post-Decision Letter Does Not Warrant a Sentence Six Remand

Plaintiff has provided the Court with a letter written by Dr. Dul on July 20, 2011. In relevant part the letter provides,

> I have been following [Ms. Tsouroullis] since [April 2006 until September 2010] for a diagnosis of breast cancer. I am a medical

24

oncologist and not her surgeon.

In reviewing my notes over this time period the patient had done fairly well after her breast cancer surgery and her reconstruction. However, she had several issues develop. . . .  [S]he had mentioned at both visits in 2008 episodes of urticaria for which she was seeing a dermatologist and allergist.   The urticaria appeared to be exacerbated by exercise.  In 2009 she noted pain in the right elbow and back and sciatic nerve pain also triggered by exercise.  In the period of time that she had reconstructive surgery and went, because of both of these complaints, although I do not record in my notes my medical advice, it is reasonable that I would have advised her to do less of the activity that was causing exacerbation of symptoms.  She has had a bilateral mastectomy which is a risk for lymphedema. Although full function is possible after bilateral mastectomy, it is not uncommon to have musculoskeletal complications which at times may limit someone's ability to do all activities with hands and shoulders.  Particularly because her job was a massage therapist, this would be a particular activity that may have exacerbated the above symptoms.

For further restriction on limitation and instructions I will usually defer to my Surgical and Plastic Surgical colleagues in regards to specific restrictions regarding activity.

(Dkt. 16 at ECF 3.)  Although not explicitly requested by Plaintiff, because she is proceeding pro se, this Court will construe the Dr. Dul letter as a request for a remand pursuant to sentence six of 42 U.S.C. § 405(g).

That sentence provides: "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  As the text of the statute indicates, a sentence six remand is only appropriate where a plaintiff can demonstrate that evidence not before the ALJ is (1) "new" and (2) "material," and (3) that there was "good cause" for not producing the evidence earlier.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Oliver v. Sec'y of Health &*

*Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).  Evidence is "new" only if it was "'not in existence or available to the claimant at the time of the administrative proceeding.'"  *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  Further, "new" evidence must not be merely cumulative of evidence already part of the record.  *Wilson v. Comm'r of Soc. Sec.*, No. 10-13828, 2011 WL 2607098, at *6 (E.D. Mich. July 1, 2011).  New evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).  A claimant shows "good cause" by providing a reasonable justification for failing to acquire and present the new and material evidence to the ALJ.  *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam).  Good cause "contemplates more than strategic delay, or sandbagging, of evidence and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability."  *Haney v. Astrue*, No. 5:07CV188, 2009 WL 700057, at *6 (W.D. Ky. Mar. 13, 2009) (internal citations omitted).

It does not appear that any of the three – let alone all three – of the sentence-six remand requirements are met in this case.  First, Plaintiff has provided the Court with no explanation why Dr. Dul could not have accompanied her RFC Assessment already of record with the letter now provided to this Court.  Accordingly, good cause has not been demonstrated.  Second, assuming good cause, Dr. Dul's letter is essentially cumulative of information in the record.  It describes Plaintiff's reported symptoms that already appear in Dr. Dul's 2008 and 2009 notes which were before the ALJ.  Further, the restrictions mentioned in the letter were already reflected in her RFC Assessment.  Third, and to the extent that the letter is not cumulative, it is not material in the sense

26

that there is no reasonable probability that a different outcome would result on remand because of

the letter. The letter merely states that "*it is not uncommon* to have musculoskeletal complications

which at times may limit *someone's* ability to do all activities with hands and shoulders," and "it is

*reasonable* that I *would have* advised her to do less of the activity that was causing exacerbation of

symptoms." (Dkt. 16 at ECF 3 (emphases added).) This language is both generalized and

hypothetical in nature. Moreover, Dr. Dul's letter provides no functional limitations (e.g., specific

lifting, walking, standing or sitting limitations) including whether Plaintiff could perform sedentary

work such as Plaintiff's past work as an emergency dispatcher.

Accordingly, sentence six remand to consider Dr. Dul's July 20, 2011 letter is not warranted.

### G. Conclusion

For the foregoing reasons, this Court finds that Plaintiff has not asserted any procedural

errors and substantial evidence supports the ALJ's disability determination. Accordingly, this Court

RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's

Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C.

§ 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*,

474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and

Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: October 18, 2011


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 18, 2011.


s/Jane Johnson
Deputy Clerk